**AFFIRM; and Opinion Filed February 27, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00059-CR

### WILLIE DESHUN WADE, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 265th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1775793-R**

## MEMORANDUM OPINION

Before Justices Brown, Schenck, and Pedersen
Opinion by Justice Brown

A jury convicted appellant Willie Deshun Wade of aggravated assault with a deadly weapon, and the trial court assessed punishment at ten years' confinement. In two issues, appellant contends the evidence is insufficient to support his conviction and the trial court erred in finding consent to search his apartment was given voluntarily. For the following reasons, we affirm the trial court's judgment.

BACKGROUND

Appellant was charged with aggravated assault with a deadly weapon. *See* TEX. PENAL CODE ANN. § 22.02(a)(2). The indictment alleged appellant intentionally, knowingly and recklessly caused bodily injury to Desiree Kelly by shooting her with a firearm.

At trial, Kelly testified that she and Anthony Jackson had picked up their fifteen-year-old daughter Kailyn from a graduation party at the Homes of Persimmon apartments in Dallas. Jackson was driving Kelly's Toyota Camry, Kelly was sitting in the front passenger seat, and Kailyn was in the backseat. They had stopped before turning left onto a four-lane road when appellant began "laying on the horn" of his Lincoln Town Car behind them. Jackson made the left turn, and appellant sped up to the passenger side of Kelly's car screaming and cursing that Jackson had taken too long to turn. Appellant drove his car into Jackson's lane, forcing Jackson to drive on the center median and stop to avoid hitting appellant's car. Jackson told appellant to "get off my car," and a passenger in appellant's car pulled a gun and said "these mother fuckers look like they want to do something." Appellant "finally" pulled away from Kelly's car and Jackson resumed driving, but appellant again drove toward Jackson's lane at a red light at the next intersection. Kelly reached for her camera and hit record. Just as she did, she heard a pop and breaking glass. She realized appellant was shooting at her car. Kelly slid down in her seat, noticed Jackson was no longer in the car, and placed the car in park. Kelly got out of the car and realized she had been shot in the chest. Jackson was shot twice in the stomach. According to Kelly, neither she nor Jackson had a gun in the car. Nor had they threatened appellant, although Jackson may have raised his voice.

Video recorded on Kelly's telephone and a still photograph made from the video were admitted into evidence and published to the jury. The photograph showed appellant in his vehicle pointing a firearm toward Kelly's car. Kelly testified she heard four shots and a male voice on the video recording. At the time, both appellant and Jackson had been yelling.

According to Kailyn, who also testified, the people in the car behind them were honking and complaining that Jackson had taken too long to turn. A few yards down the road, the other car pinned them at the median and Jackson could not drive without damaging the cars. The other

car finally drove off, but shots were fired when Jackson pulled up to a red light. Kailyn did not see or hear Jackson digging around for anything in the car, but acknowledged she did not "completely" have her eyes on either Jackson or Kelly. Neither Jackson nor Kelly made any threats. Kailyn heard Jackson yelling either once the shots were fired or seconds before the shots when he saw the gun. Kelly videoed the altercation "just in case anything happened," but Kailyn did not recall when Kelly started recording other than it was by the time the shots were fired.

Latosha Fry, who worked at a nearby gas station, testified she went outside after hearing gunshots and saw a man and woman jump out of a car at the intersection. The man was trying to remove his shirt, while the woman slouched in the grass. They looked hurt, and Fry thought they may have been shot. She dialed 911 to report a shooting. Fry did not observe the man or the woman move from the median area near their car or throw anything the size and shape of a firearm.

Dallas Police Department (DPD) patrol officer Fernando Garcia responded to the scene to find Kelly and Jackson in the median. Both had been shot and appeared to be in shock. Kelly was able to describe the suspects and appellant's vehicle to Garcia. Garcia secured the crime scene. Officers obtained surveillance camera video from one gas station, but the video did not show the altercation. Fifty or so people were watching from nearby gas stations when Garcia arrived. Garcia acknowledged that interviewing all of those people would have made the investigation more thorough, but nobody wanted to say anything when he went to the gas stations looking for witnesses. Garcia testified the crime scene was in an area with high crime and gang activity.

DPD officer Charles Schultz interviewed both Kailyn and Kelly at the hospital where Kelly and Jackson were treated. Kailyn, who was terrified, related that her family was exiting the apartment complex when someone in a car behind them was upset they took too long at the intersection. That car proceeded to the passenger side of Kelly's car and fired about three shots

into the car. Schultz subsequently spoke with Kelly, whose recollection of events was consistent with Kailyn's statement.

DPD detective Derek Gaffney testified to observing blood stains, cartridge cases, and apparent bullet hole defects in the passenger side of Kelly's Camry when he arrived at the scene. He viewed video from a gas station surveillance camera, but it showed only the Camry pulling up to the location and the suspect vehicle driving away. Gaffney received three or four Crime Stoppers tips that led him to appellant as the suspected shooter. Thereafter, appellant was arrested, and police recovered a firearm at his apartment.

On cross-examination, Gaffney acknowledged there were additional avenues of investigation that would have been helpful and resulted in a more thorough investigation. For example, Gaffney did not attempt to speak with anyone at the Homes of Persimmons apartments or obtain video from surveillance cameras there. Gaffney also had not realized Ingram & Son, a business near the shooting site, had a surveillance camera. Gaffney spoke with, but did not have a recorded statement from, Jackson. Nor did Gaffney conduct a forensic check on Kelly's telephone despite the fact that she emailed the video to him more than twenty-four hours after the shooting. Gaffney also had no witness statements from the fifty to seventy-five people on the corner when he arrived at the crime scene, although he explained this was common because people do not want to speak to the police. Finally, Gaffney's notes did not contain an inventory search form. He testified, however, that he would have been notified had anything been found during the inventory search of Kelly's car. Gaffney further testified that no investigation is completely exhaustive, and there is an infinite number of things that can be done to investigate any case. He believed the investigation was thorough and complete to the best of his abilities.

DPD crime scene analyst Rebecca Kerr processed the secured crime scene, which was "very large." She collected four fired cartridge cases, all of the same caliber and headstamp, next

to and behind Kelly's car closest to the passenger side and a fired bullet inside the car. Kerr found Kelly's telephone on the median. She returned the telephone to Kelly and did not know if anyone else had handled it before she found it. She and her assistant both searched Kelly's car and did not locate a firearm. Had there been one at the offense location, Kerr believed they would have found it.

DPD firearms examiner Charles Clow examined the cartridge cases and bullet retrieved from the crime scene and the firearm recovered from appellant's apartment. Clow tested the firearm and concluded each of the fired cartridge cases and the bullet were fired from the firearm.

Steven Maize, the passenger in appellant's car, testified they were stopped behind a car exiting the Homes of Persimmon apartments when two or three cars pulled up behind them and started honking. Appellant also honked, and they heard "a lot of cussing and stuff coming from the front car." When the cars turned, the front car slowed, and its driver rolled down the passenger window and "started talking crazy and cussing." Their cars did not hit, but "it was real close." The driver "went digging down" on the right side of his seat like he was reaching for something and opened his door. Maize told appellant what the driver was doing, and appellant reached for his gun. Until then, Maize had not known there was a gun in the car. The woman in the other car was telling the driver to "leave it alone," but he was angry and not responding to her. A shot went off, and the woman screamed. Appellant shot back, and the driver rolled out of his car, tripping and trying to go around behind the car. Maize thought the driver shot the woman, but he only heard, and did not see, the shooting. After the shots were fired, appellant sped through the intersection.

On Kelly's telephone video recording, Maize heard the driver's voice and a gun rack, but it was not appellant racking his gun. Maize thought the driver would have shot them had appellant not fired his gun. Later, he saw the incident reported on the news and knew police would have

–5–

questions, but never thought to contact them because "they said it was a kid in the car with him" and Maize thought he and appellant were "in the right."

The trial court instructed the jury on self-defense, but the jury rejected the defense and found appellant guilty of aggravated assault with a deadly weapon.

## SUFFICIENCY OF THE EVIDENCE

In his first issue, appellant argues the evidence is insufficient to support his aggravated assault with a deadly weapon conviction because no rational jury could have found against him on his claim of self-defense. Specifically, appellant contends the evidence shows he reasonably believed deadly force was immediately necessary to protect himself from the use or attempted use of unlawful deadly force.

A defendant commits the offense of aggravated assault with a deadly weapon if the defendant commits assault as defined in penal code section 22.01 and uses or exhibits a deadly weapon during the commission of the assault. *See* TEX. PEN. CODE ANN. § 22.02(a)(2). A defendant commits assault under section 22.01 if the defendant "intentionally, knowingly, or recklessly causes bodily injury to another." *Id.* § 22.01(a)(1). A firearm is a deadly weapon. *See id.* § 1.07(a)(17)(A).

Under certain circumstances, self-defense may justify a defendant's use of deadly force against another. *See id.* § 9.32(a). "Deadly force" is "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3). A defendant is justified in using force against another when and to the degree the defendant reasonably believes the force is immediately necessary to protect the defendant against the other's use or attempted use of unlawful force. *See id.* § 9.31(a). A defendant is justified in using deadly force against another (1) if the defendant would be justified in using force and (2) when and to the degree the defendant reasonably believes the deadly force

is immediately necessary to protect the defendant against the other's use or attempted use of unlawful deadly force. *See id.* § 9.32(a). A "reasonable belief" is a belief that would be held by an ordinary and prudent person in the same circumstances as the defendant. *See id.* at § 1.07(a)(42).

The defendant has an initial burden to produce evidence supporting a justification defense. *Braughton v. State*, No. PD-0907-17, 2018 WL 6626621, at *12 (Tex. Crim. App. Dec. 19, 2018). If the defendant produces some evidence, the State has the burden of persuasion to disprove the defense. *Id.*; *Gaona v. State*, 498 S.W.3d 706, 709 (Tex. App.—Dallas 2016, pet. ref'd). The State need not produce evidence refuting the defense; it may meet its burden by proving its case beyond a reasonable doubt. *Braughton*, 2018 WL 6626621, at *12. If the jury determines the defendant is guilty, there is an implicit finding against the defensive theory. *Id.*

For a challenge to the sufficiency of the evidence supporting a jury's rejection of a justification defense, we view all the evidence in the light most favorable to the verdict and determine whether any rational factfinder would have found beyond a reasonable doubt (1) the essential elements of the offense and (2) against the defendant on the defensive issue. *Id.* Self-defense is a fact issue determined by the jury, which resolves any conflicts in the testimony and determines the credibility of the witnesses and the weight to be given their testimony. *Id.* at *11–12. If the record supports conflicting inferences, we defer to the jury's determination, presuming it resolved the conflicts in favor of its verdict. *Id.*

Appellant does not argue the State failed to prove any element of the aggravated assault offense, but contends he shot at Kelly's car only because he "thought he was under attack and was in fear of the use of unlawful deadly force against him[self]." In doing so, he cites the evidence that the altercation took place in a high crime area full of gang activity and Maize's testimony that Jackson's voice and Jackson racking a gun can be heard on the video recording. Appellant also

complains the State did not do "a good job investigating this case" and could have done more to establish "the verity of [Kelly's] assertion that the encounter was unprovoked."

The jury heard evidence supporting a claim of self-defense, including Maize's testimony that, as a result of Jackson "talking crazy and cussing" and "digging down" in his seat like he was reaching for something, Maize thought Jackson would have shot them had appellant not fired his weapon. The jury also heard evidence that police could have possibly obtained additional video of the altercation and more witness statements, conducted a forensic analysis of Kelly's telephone, and shown the extent of the inventory search of Kelly's car. But appellant ignores conflicting evidence that supports the jury's rejection of his justification defense. There was testimony that neither Jackson nor Kelly owned or carried a firearm. No firearm was located during a search of Kelly's car or at the scene. Neither Jackson nor Kelly threatened appellant, and Maize first brandished a firearm. Kelly was so concerned that she began recording the confrontation, and a still shot from her video shows appellant aiming a firearm toward the passenger-side window of her car. The fired cartridge cases and bullet located at the scene were fired from the gun recovered from appellant's apartment.

The jury, charged with resolving the conflicts in the evidence, was free to conclude appellant was the aggressor, he was not responding to the use of deadly force, and his use of deadly force was not immediately necessary to protect himself. *See* PEN. § 9.32(a). Considering all the evidence in a light most favorable to the verdict, we conclude the jury could have rationally found beyond a reasonable doubt that appellant, using a deadly weapon, intentionally, knowingly, or recklessly caused bodily injury to Kelly and also could have rejected appellant's claim of self-defense. *See* PEN. § 22.02(a)(2); *see also, e.g., Gaona*, 498 S.W.3d at 710. Accordingly, we overrule appellant's first issue.

CONSENT TO SEARCH

In his second issue, appellant contends the trial court erred in denying his motion to suppress evidence of the firearm, along with two magazines, forty-four rounds of ammunition and a black holster, recovered from appellant's apartment without a search warrant. Appellant argues Sherlanski Donaldson's consent to the search was involuntary due to duress and coercion.

At a pretrial hearing on appellant's motion, DPD Sergeant James Shirley testified he was called to an apartment building where appellant had been apprehended in his vehicle. In the parking lot, DPD officer James Gentry was speaking with Donaldson, who Shirley believed appellant had identified as his wife. Gentry asked if Donaldson knew where appellant kept his gun, and she responded that she did not know. Shirley asked Donaldson to keep a close eye on a toddler he saw in the apartment in case appellant had stashed a gun there. Donaldson stopped Shirley as he was leaving because appellant "had been doing something under her sink" and she wanted to make sure nothing posed a danger. Shirley and Gentry entered the apartment, and Donaldson pointed to a cabinet and directed Gentry to a panel over a hole in the wall under the cabinet. Gentry moved the panel and found a shopping bag containing a gun, magazines, and ammunition. Shirley did not ask to search the apartment or use coercive language to locate the gun. Shirley and Gentry searched only the sink area and were in the apartment no more than five minutes.

Donaldson testified she was in the apartment at the time of appellant's arrest. An officer came to the door and asked her to step outside and identify appellant. About ten minutes later, the officer returned, asserting appellant said Donaldson knew where his gun was located. Donaldson said she did not know what he was talking about, to which the officer responded that, if he came back, "it's not gonna be nice." Donaldson said she did not have anything to hide, the officer replied that he was not going to take her word for it, and she told him he could search if he wanted to do

so. Donaldson testified she was scared and "under distress, duress." However, she also testified the officers were "calm" and "nice" and did not put their hands on her. She gave the officers consent to search because she had nothing to hide. Donaldson denied ever flagging an officer down, directing an officer to her kitchen sink, knowing the gun was under the kitchen sink, or that an officer told her to take care due to the toddler. She also testified that the officers were in the apartment approximately twenty-five minutes and searched more than just the kitchen.

At the close of the hearing, the trial court noted it found Donaldson's story the more believable. Even so, the trial court believed she gave consent and the officers' actions did not render the consent involuntary. The trial court denied the motion to suppress, but never entered any written findings of fact.

Appellant re-urged his motion at trial, but the trial court admitted the items into evidence during Shirley's testimony. Shirley again testified that, when he arrived at the apartment building, Gentry was speaking with Donaldson, who had come out of the apartment. A young woman and a toddler were standing in the apartment doorway. Shirley asked Donaldson to keep an eye on the toddler in case appellant had stashed a gun. When Shirley was driving away, Donaldson stopped him because she was concerned about something in her apartment. Shirley called Gentry back to the apartment, and Donaldson let them in and directed them to the kitchen sink. Inside the cabinet, a wood panel covered a hole. Gentry removed the panel and found a shopping bag containing a 9-millimeter handgun, two magazines, a nylon holster, and a box of ammunition. Shirley believed the location suggested appellant was attempting to conceal the weapon.

According to Gentry, who also testified at trial, appellant had asked for some medication and paperwork from his apartment and said his wife could help. Donaldson answered when Gentry knocked on the apartment door and retrieved the medication and paperwork. Gentry asked Donaldson if appellant kept a firearm in the house or if she knew where one was, and she responded

–10–

that she did not know. Gentry subsequently returned to the apartment with Shirley, and Donaldson allowed them to enter. Inside, she led them into the kitchen and under the sink to a hole in the wall containing a plastic bag with a firearm and ammunition. The officers would not have found the hole had Donaldson not led them to it. They did not search anywhere else in the apartment, and Gentry would not have entered the apartment if Donaldson had not let him enter.

A search conducted pursuant to a voluntary consent is an exception to the Fourth Amendment's general prohibition on warrantless searches. *See Tucker v. State*, 369 S.W.3d 179, 185 (Tex. Crim. App. 2012); *Meekins v. State*, 340 S.W.3d 454, 458 (Tex. Crim. App. 2011). Consent is not voluntary if it is the product of duress or coercion, actual or implied. *Gutierrez v. State*, 221 S.W.3d 680, 686 (Tex. Crim. App. 2007). The State must show by clear and convincing evidence that consent to search was given voluntarily. *Id.* Whether consent is voluntary is a fact question determined by the totality of the circumstances from an objectively reasonable person's point of view. *Tucker*, 369 S.W.3d at 185; *Gutierrez*, 221 S.W.3d at 686. A trial court may consider numerous factors relevant to voluntariness, including "physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity" of the person. *Meekins*, 340 S.W.3d at 460, n.26 (quoting *United States v. Pena*, 143 F.3d 1363, 1367 (10th Cir. 1998)).

We review a trial court's finding of voluntary consent for an abuse of discretion and must accept the finding unless it is clearly erroneous. *See Meekins*, 340 S.W.3d at 460, 465. The prevailing party "is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *Id.* at 460 (quoting *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008)). If there are no written findings explaining the factual basis for the trial court's decision, we imply findings of fact that support the trial court's decision as long as the evidence, viewed in the light most favorable to the trial court's ruling, supports those

findings. *See Meekins*, 340 S.W.3d at 460. When the parties re-litigate a suppression issue at trial following a pretrial suppression hearing, we consider the evidence from both the pretrial hearing and the trial. *See Gutierrez*, 221 S.W.3d at 687.

Appellant asserts, based on the totality of the circumstances, that Donaldson's consent was coerced or made under duress because she simply acquiesced to an officer's insistence that she knew where appellant's gun was located and was told it would not "be nice" if the officer had to return. Appellant further contends that, because the trial court expressly found Donaldson's account more credible, it erred in determining her consent was voluntary.

The trial court did not enter written findings of fact, so we must imply findings that support its decision so long as the evidence, viewed in the light most favorable to its ruling, supports the findings. *See Meekins*, 340 S.W.3d at 460. And, viewed in the light most favorable to the trial court's ruling, the evidence supports an implied finding that Donaldson's consent was not the product of coercion or duress and, thus, was voluntary. Considering the totality of the circumstances surrounding the search from an objectively reasonable person's point of view, the trial court was free to find the officer's statements did not constitute a threat, mistreatment, or force sufficient to taint the voluntariness of Donaldson's consent. Indeed, Donaldson testified she consented to the search because she had nothing to hide. She further testified the officers were "calm" and "nice" and did not put their hands on her. Accordingly, we conclude the trial court's ruling that Donaldson voluntarily consented to the search is not clearly erroneous and, thus, not an abuse of discretion. We overrule appellant's second issue.

We affirm the trial court's judgment.

/Ada Brown/
ADA BROWN
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

180059F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

WILLIE DESHUN WADE, Appellant

No. 05-18-00059-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 265th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F-1775793-R.
Opinion delivered by Justice Brown; Justices Schenck and Pedersen participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 27th day of February, 2019.